## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOHN DOE,<br>c/o Friedman Nemecek Long & Grant, LLC, 1360 E. 9th Street, Suite 650, Cleveland, Ohio 44114 | : | CIVIL NO. _____ |
|  | : |  |
|  | : |  |
|  | : |  |
| Plaintiff, | : | **JURY TRIAL DEMANDED** |
|  | : |  |
| v. | : |  |
|  | : |  |
| UNIVERSITY OF PITTSBURGH – OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION,<br>4200 Fifth Ave,<br>Pittsburgh, PA 15260 | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| LAUREL GIFT, Individually and in her official capacity as Assistant Vice Chancellor for Compliance, Investigations & Ethics<br>4200 Fifth Ave,<br>Pittsburgh, PA 15260 | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| KRISTI HEIDEL, Individually and in her official capacity as Investigator for Compliance, Investigations & Ethics<br>4200 Fifth Ave,<br>Pittsburgh, PA 15260 | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| VANESSA LOVE, Individually and in her official capacity as Director for Civil Rights and Title IX<br>4200 Fifth Ave,<br>Pittsburgh, PA 15260 | : |  |
|  | : |  |
| and | : |  |

|  | : |
| --- | --- |
| JAMES GALLAHER, Individually and in | : |
| his official capacity as Vice Chancellor of | : |
| Human Resources | : |
| 4200 Fifth Ave, | : |
| Pittsburgh, PA 15260 | : |
|  | : |
| and | : |
|  | : |
| DAVID DEJONG, Individually and in his | : |
| official capacity as Senior Vice Chancellor | : |
| 4200 Fifth Ave, | : |
| Pittsburgh, PA 15260 | : |
|  | : |
| and | : |
|  | : |
| JOHN ROES 1-5 | : |
| 4200 Fifth Ave, | : |
| Pittsburgh, PA 15260 | : |
|  | : |
| Defendants. | : |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
### (Jury Trial Demanded)

NOW COMES Plaintiff, John Doe[1], by and through undersigned counsel, Eric F. Long

(pending pro hac vice admission) and Tyler J. Walchanowicz (pending pro hac vice admission),

of Friedman Nemecek Long & Grant, L.L.C., and for his cause of action against the Defendants,

University of Pittsburgh, Laurel Gift, Kristi Heidel, Vanessa Love, James Gallaher, David DeJong,

and John Roes 1-5  states the following:

---

[1] Plaintiff is contemporaneously filing a Motion for Permission to Proceed under Pseudonym.  Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis of this Complaint, and the fact that the University is fully aware of his identity and will not be prejudiced in any way.

## NATURE OF THE ACTION

1.     This action arises from sex discrimination, unlawful retaliation, and violations of the Title IX of the Education Amendments of 1972 ("Title IX"); John's Due Process rights as afforded to him by the Fourteenth Amendment of the United States Constitution; and breach of contractual obligations and promises by Defendants. These violations and breaches resulted in erroneous findings of responsibility and sanctions against John after he was falsely accused and found liable for violating University Policies on Consensual Relationships ("CS-02") and Sexual Misconduct ("CS-20").

2.     After John, a male postdoctoral trainee, was falsely accused of various forms of abuse constituting sexual harassment from 4 years prior by Jane Roe, a female student, Defendants put John through a deeply flawed, impartial, and bias-ridden process that John was forced to endure for 539 days, which unjustifiably resulted in John being, among other things, barred from campus under threat of arrest and future employment with the University.

3.     Rather than proceed under the appropriate Title IX Policy (CS-27), which cloaked John with basic due process rights essential for defending against the allegations, Defendants incorrectly and purposefully investigated and adjudicated the allegations under University Policies CS-20 and CS-02 in a calculated effort to strip John of his due process rights.

## JURISDICTION

4.     This Court has jurisdiction pursuant to 28 U.S.C §1331, 28 U.S.C. §1343, 42 U.S.C. §1983 and §1988, 20 U.S.C. §1681, et seq., and the Fourteenth Amendment to the Constitution of the United States of America.

3

5.    Supplemental jurisdiction over Plaintiff's state law claims is invoked pursuant to 28 U.S.C. § 1376 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

## VENUE

6.    Venue is appropriate under 28 U.S.C. § 1391(b).

## PARTIES

7.    Plaintiff, John Doe, is a natural person who resides in Lorain County, Ohio. At all relevant times, John was affiliated with the University of Pittsburgh, either as an employee or as a member of a research laboratory, participating in University activities and/or utilizing University property/resources.

8.    Defendant University of Pittsburgh ("the University") was, at all relevant times, and continues to be a public university organized and existing under the laws of the Commonwealth of Pennsylvania.

9.    University of Pittsburgh is a state-related university within the Pennsylvania system of high education with its principal place of business located at 4200 Fifth Avenue, Pittsburgh, Pennsylvania, 15260.

10.    Defendant University of Pittsburgh receives, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

11.    Defendant Laurel Gift was, at all relevant times to this action, an employee of the University of Pittsburgh, serving as Assistant Vice Chancellor for Compliance, Investigations & Ethics. Defendant Gift is sued in her individual and official capacities. Defendant Gift is a person

under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

12.     Defendant Kristi Heidel was, at all relevant times to this action, an employee of the University of Pittsburgh, serving as Investigator for Compliance, Investigations & Ethics. Defendant Heidel is sued in her individual and official capacities. Defendant Heidel is a person under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

13.     Defendant Vanessa Love was, at all relevant times to this action, an employee of the University of Pittsburgh, serving as Director for Civil Rights and Title IX. Defendant Love is sued in her individual and official capacities. Defendant Love is a person under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

14.     Defendant James Gallaher was, at all relevant times to this action, an employee of the University of Pittsburgh, serving as Vice Chancellor of Human Resources. Defendant Gallaher is sued in his individual and official capacities. Defendant Gallaher is a person under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

15.     Defendant David DeJong was, at all relevant times to this action, an employee of the University of Pittsburgh, serving as Senior Vice Chancellor. Defendant DeJong is sued in his individual and official capacities. Defendant DeJong is a person under 42 U.S.C. § 1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

16.     Defendants Roes 1-5 were at all relevant times to this action employees of the University and they are final decisionmakers. Defendants Roes 1-5 are sued in their individual capacities. Defendants Roes 1-5 are persons under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law.

## FACTUAL BACKGROUND

17.     In 2016, John was recruited to serve as a postdoctoral trainee in the University laboratory ("the Laboratory").

18.     In October 2016, John accepted an offer from the University and was hired to work in the Laboratory as a postdoctoral trainee.

19.     In summer 2017, Jane Roe was preparing to enter into the final year of her undergraduate program at the University. At that time, John still was employed as staff serving in his role as a postdoctoral trainee.

20.     Jane Roe was hired that summer by the University, where she was tasked with working on a separate project than John. Through her work, Jane met John.

21.     At no time did John participate in the hiring of Jane.

22.     At no time did John perform any supervisory function pertaining to Jane.

23.     Over time, John and Jane's friendship grew into a romantic relationship.

24.     At the time, the University maintained a policy regarding consensual relationships. Under the policy, consensual relationships were prohibited between individuals wherein one individual was designated a supervisor of the other or was likely to become one.

25.     During the course of their romantic relationship, John was not designated Jane's supervisor, nor was he ever designated as Jane's supervisor. As such, John and Jane's relationship was not a violation of University policies.

26.     In fall 2017, University personnel suggested hiring an undergraduate student to work alongside John. It was John's understanding that this undergraduate student would not be placed under John's supervision.

27.     In October 2017, John met with a student from the University who expressed interest in working on the project.

28.     Upon learning of this, Jane became angry as the analysis assigned to her reached an end point, but she strongly desired to continue working in the Laboratory.

29.     Jane then approached Laboratory personnel, who decided to retain Jane.

30.     At no time did the University's designation of supervisor transfer to John nor did John perform any supervisory function related to Jane's employment, including but not limited to approving her timecards, completing evaluations of her performance, etc.

31.     Jane and John's relationship continued to grow, eventually leading to cohabitation when the lease on Jane's apartment expired.

32.     In spring 2018, Jane was accepted into multiple graduate programs and decided to attend a university in another state.

33.     In May 2018, Jane moved out of state, which resulted in her and John making the decision to continue their relationship on a long-distance basis. Jane and John visited one another on multiple occasions after Jane left Pittsburgh. However, the relationship ultimately came to an end later that summer, when Jane told John that she had entered into a romantic relationship with someone where she lived.

34.     Despite the breakup, Jane and John continued to communicate with each other. At no point did Jane communicate any concerns about their previous relationship nor accuse John of being abusive, sexually or otherwise, towards her.

35.     In fall 2018, there was a conflict between Jane and John stemming from Jane's desire for John to be her date to her friend's wedding.  Although John previously agreed to attend, John was uncomfortable doing so because Jane was in a relationship with someone else and did not disclose to her partner that she was planning to attend the wedding with John. When John expressed these concerns, Jane became angry with John. John ultimately did not attend the wedding, and his communications with Jane became less frequent and more adverse.

36.     Around that same time, John received an email from a faculty member, notifying him that complaints had been received from another laboratory regarding John's behavior. John was not given details of the allegations but was instructed to discontinue interactions with members of that laboratory.

37.     At no time was an official investigation into these complaints launched. Instead, John met with his supervisors, who agreed that there were concerns regarding the validity of the complaints and stated that no punitive action would be taken against John.

38.     John's appointment with the University ended in July 2020, but he continued to work in the Laboratory and used University resources. John eventually moved away from the Laboratory to another location in early 2021. However, John regularly visited the Laboratory after moving in order to work with collaborators on analyses and assist other Laboratory faculty who asked John for help with their projects.

39.     On October 28, 2022, John received an email from the University Office of Compliance, Investigations & Ethics ("CIE Office") with a letter attached, alleging that, "during the 2017-2018 academic year, you engaged in a romantic relationship with an undergraduate student whom you supervised. During the course of that relationship, you engaged in forms of sexual harassment of that student, including academic, emotional, and physical abuse."

40.     The letter from the CIE Office indicated that John's conduct was alleged to have violated the University's Sexual Misconduct Policy (CS-20). The letter promised that the CIE office would investigate these claims and engage in a "fact-finding" process.

41.     The letter from the CIE Office also indicated that "the University prohibits retaliation against anyone who makes a complaint, responds to a complaint, or otherwise participates in the investigatory process." A document containing the University's Statement on Confidentiality and Non-Retaliation in Connection with Investigations was also attached to the email sent to John by the CIE Office. The statement expressly indicates that "The University prohibits retaliation against anyone who makes a complaint or otherwise participates in the investigation process or supports a complaint. Retaliation should be understood to be adverse action taken as a result of engaging in such protected conduct, or an action that would deter a reasonable person from participation."

42.     The University's Statement on Confidentiality and Non-Retaliation in Connection with Investigations also expressly indicates that "All reasonable efforts will be made to comply with guidelines [stipulated in relevant policy/procedure] related to timeliness. When required, a written request for an extension may be granted."

43.     CS-20 stipulates that "Where a complaint is submitted, the University generally attempts to resolve the complaint from the filing of a complaint to determination within sixty (60) days. If the outcome of the complaint is appealed, the University then generally attempts to make a timely determination of any appeal. However, extenuating or more complex circumstances may preclude the University from resolving a complaint within the timeframes stated here. The Office of Civil Rights and Title IX will make a determination as to any reasonable extension of these

timeframes. Complainants and respondents will be provided with periodic updates as to the status of the process."

44.     The letter from the CIE Office concluded, "Please do not hesitate to contact me should you have any questions regarding the investigation process." The letter was signed by Laurel Gift, Assistant Vice Chancellor for Compliance, Investigations & Ethics.

### *The University's Policies and Procedures for Claims of Sexual Misconduct*

45.     In handling complaints of sexual misconduct, University of Pittsburgh, and its employees, are bound to follow federal law, including but not limited to Title IX of the Education Amendments of 1972 ("Title IX"), related regulations, and judicial precedent.

46.     Sexual Harassment and/or Sexual Misconduct falls within the purview of Title IX if the Sexual Harassment and/or Sexual Misconduct occurred "in a school's education program or activity."

47.     University of Pittsburgh's Title IX Policy (CS-27) outlines the definitions and procedures that must be followed. *See* CS-27 Policy and Procedures attached hereto as *Exhibit A*.

48.     CS-27 defines a "complainant" as, "An individual who is alleged to be the victim of conduct that could constitute Sexual Harassment."

49.     CS-27 defines a "respondent" as, "An individual who has been reported to be the perpetrator of conduct that could constitute Sexual Harassment."

50.     CS-27 defines "education program or activity" as, "locations, events, or circumstances, occurring within the United States, over which the University exercises substantial control of both the Respondent and the context in which the Sexual Harassment occurs."

51.     The allegation against John was that he engaged in sexual harassment against a student that he supervised, while she was an undergraduate student at the University.

52.     The allegations against John included, at least in part, allegations of physical abuse.

53.     The alleged conduct supposedly occurred in the University of Pittsburgh's educational program, meaning Jane's allegations triggered Defendants' obligations under Title IX.

54.     At the time of the alleged conduct, the University exercised control over both the respondent, as well as the context in which the alleged sexual harassment occurred.

55.     Defendants elected to proceed under University of Pittsburg's Sexual Misconduct Polciy (CS-20) rather than the legally mandated Title IX process for adjudicating claims.   This decision was made with the intent and purpose of stripping John of the due process rights he is afforded under CS-27, as well as Title IX regulations.

56.     On its face and as applied, CS-20 is designed to be an unfair process, giving little to no rights to the accused nor meaningful opportunity to defend oneself. *See* CS-20 Policy and Procedures attached as *Exhibit B*.

57.     Under CS-20, a respondent is not entitled to any of the following:

      i.  A review of the evidence;

     ii.  A review of witness statements, including statements from the complainant;

    iii.  An opportunity to respond to evidence or witness statements;

    iv.  Any meaningful opportunity to be heard.

58.     Under federal law, and University of Pittsburgh's Title IX Policy, John was entitled to specific rights.

59.     Under CS-27, "Upon receipt of a Formal Complaint alleging Sexual Misconduct, the Office of Civil Rights and Title IX will provide written notice to any known Complainant(s) and Respondent(s) outlining the following:

     i.   Policy CS 27 and this Procedure;

     ii.   The allegations potentially constituting a violation of Policy CS 27, including identification of Complainant(s) and Respondent(s), the conduct allegedly constituting Sexual Harassment, and the date and location of the alleged incident, if known;

     iii.   The standard of evidence being the preponderance standard, as well as a statement the Respondent is presumed not responsible (but that this presumption does not imply that the allegations did not occur or that a Respondent is truthful or that a Complainant is lying);

     iv.   The right of both parties to have an Advisor of choice;

     v.   The right of both parties to review evidence consistent with this Procedure; and

     vi.   The relevant section of the Code of Conduct and/or University policies and guidelines related to knowingly making false statements or knowingly submitting false information.

60.    The written notice provided to John contained no such information, nor did it contain any similar language that could be construed to convey these required notices.

61.    Per CS-27, "An assigned investigator shall gather evidence and witness statements related to the allegations in the Formal Complaint. The assigned investigator shall not be the Title IX Coordinator, the Decision-Maker, or the Appellate Decision-Maker. The investigation will involve the collection and review of relevant evidence, including documents, electronic data, tangible objects, and/or any other material pertinent to the allegations. All available evidence shall be identified and documented. Where possible, all available evidence shall be collected and

maintained in electronic format. Both Complainant and Respondent will have an equal opportunity to present evidence to the investigator."

62.     Per CS-27, "The Complainant and Respondent are permitted to bring one Advisor of their choice and one Support Person of their choice to any/all meetings with the investigator."

63.     Per CS-27, "Prior to the completion of the investigative report, the investigator shall provide both Complainant and Respondent with an equal opportunity to inspect and review any evidence that is directly related to the allegations in the Formal Complaint that is obtained as part of the investigations (including witness summaries), regardless of whether that evidence is deemed relevant by the investigator. Parties will be permitted to submit to the investigator a written response to the evidence for the investigator to consider. This written response is due ten (10) business days from the date upon which the parties were provided access to the evidence referenced above."

64.     Per CS-27, "At the conclusion of the investigation and, after reviewing the written submission of the parties (if any), the investigator shall prepare an investigative report. The report shall fairly summarize the allegations and all relevant evidence. The report shall also include a description of the procedural steps taken during the investigation, including notifications sent to parties, interviews, site visits, and methods used to gather evidence. Once complete, the investigative summary will be provided to the Decision-Maker as well as both the Complainant and the Respondent (and their Advisors of choice). Parties will be permitted to submit to the Decision-Maker a written response to the investigative summary. This written response is due ten (10) business days after the date upon which the parties were provided the investigative summary. The hearing shall take place no sooner than one (1) business day after the written responses to the investigative summary are due to the Decision-Maker."

65.     Per CS-27, "A live hearing will take place related to the allegations of Sexual Harassment. The live hearing shall follow procedures and rules of decorum outlined by the Office of Civil Rights and Title IX and provided to the parties and their Advisors prior to the hearing… The hearing is overseen by the Decision-Maker, who will make a determination as to whether the Respondent is responsible for violating Policy CS 27. The Decision-Maker shall not be the Title 7 IX Coordinator, the investigator or the Appellate Decision-Maker."

66.     At the hearing, "parties, through their Advisors, will have the opportunity to cross-examine all witnesses and the other party."

67.     The procedures outlined in ¶¶ 59-66 are consistent with the Title IX federal regulations.

68.     Upon receipt of the letter, John contacted the investigator, Kristi Heidel, via telephone.

69.     During their initial conversation, John expressed disbelief in the allegations and asked Heidel for the identity of the accuser. Heidel refused to identify the accuser. John also asked Heidel to identify all persons who were aware of the allegations. Heidel was unable to give John an answer.

70.     John then emailed Laurel Gift, Vice Chancellor of the CIE Office, notifying her that he spoke to Heidel, and asking for the identities of the accuser and the persons who knew about the allegation. In response, Gift replied that she and/or the University notified John's supervisors at his current employer (which was not the University) of the allegations.

71.     On November 16, 2022, John sat for an interview with Heidel. Prior to the interview, John asked that the interview be recorded and that he be provided with a copy of the recording. Heidel refused to provide John with a copy.

72.    During the interview, John was asked whether John "dated his students." In response, John said no.

73.    Heidel then asked John about two female Laboratory members who University personnel previously alleged to have made complaints about John.

74.    John was never provided notice of these allegations.

75.    These female Laboratory members were not Complainants. John was not being investigated for claims made by these two females. As such, questions regarding other individuals were irrelevant and inappropriate. Still, John denied any wrongdoing.

76.    John explained to Heidel that he never supervised Jane.

77.    John explained to Heidel that the designation of supervisor is a matter of University record.

78.    John never made hiring decisions, assigned Jane to work on any specific project, evaluated Jane's performance, or had any other consequential influence over Jane's Laboratory employment and/or University education.

79.    Heidel never asked John about any alleged abuse at any point during the interview, nor did she notify John about any conduct that would have constituted abuse as alleged by Jane. John gave Heidel two letters written by Jane, each of which expressed positive feelings towards John. In response, Heidel asked John why Jane would make the allegations against John, improperly shifting the burden onto John. John repeated his concerns about factors motivating the matter and who may have been involved.

80.    At the conclusion of the interview, Heidel did not request any additional information from John except for an email Jane sent John in spring 2019 thanking him for helping her with a fellowship application. Despite John offering to provide text messages to Heidel

documenting John and Jane's relationship, Heidel did not express any desire to review said text messages.

81.     After the interview concluded, John restated to Heidel that other facts and evidence could be produced if Heidel deemed it relevant and necessary. John urged Heidel to reach out if she needed anything.

82.     Heidel never requested additional information or evidence.

83.     John also asked Heidel if he would be provided with a copy of the investigation report. In response, Heidel stated that she would do her best to make it available to John.

84.     Heidel never provided John with the investigation report.

85.     On March 8, 2023, nearly four months after his interview, John emailed Heidel seeking an update. In response, Heidel stated that interviews had been completed and final edits were being made to the investigation report.

86.     On March 24, 2023, John emailed Heidel requesting another opportunity to discuss the matter. In response, Heidel expressed a willingness to meet and asked John about his availability the following week.

87.     On March 27, 2023, John replied to Heidel, expressing concerns regarding the policies employed by University of Pittsburgh, as well as further inquiries to provide additional evidence. Heidel never responded. John called Heidel's office phone but never received an answer.

88.     On July 3, 2023, John attended a video call with a mentor and other collaborators on a project. After the meeting concluded, John remained on the line to speak with the mentor individually, regarding the allegations against John and John's career path. The mentor abruptly cut off John, advising him that the mentor along with other University staff received two investigation reports and decided to remove John's affiliation with the Laboratory.

89.     During the same conversation, John's mentor advised that the adverse action taken against John was decided by Laboratory faculty, John's mentor made clear that the adverse action was taken by the Laboratory, not the University.

90.     The Laboratory is an extension of and affiliated with the University of Pittsburgh.

91.     John then contacted Gift via email, to express concerns about Heidel's lack of communication regarding the process, including what policy was in place, as well as several procedural irregularities.

92.     Gift responded four days later via email, advising John that CS-20, not CS-27 (i.e., Title IX), was used to investigate the matter and opining that the University followed its policies and procedures.

93.     In response, John informed Gift that he was under the impression that CS-27 procedures were being used to investigate the matter and expressed concern that he was never corrected on this issue by Heidel, nor did the CIE Office ever provide John copies of the CS-20 policy and procedure as stipulated by said policy/procedure.

94.     John also asked Gift why the investigative report was disclosed to those not affiliated with the CIE Office and without roles defined by University policies and procedures. Gift could not answer John and referred him to Vanessa Love, the University's Civil Rights and Title IX Director.

95.     John contacted Vanessa Love. John asked Love about the production of confidential information contained in the report, as well as the sanctions against him by the University and the Laboratory. In response, Love scheduled a meeting with John via Microsoft Teams.

96.     During the meeting, Love insisted that the University had not decided on sanctions against John, despite that John's affiliation with the Laboratory was removed.

97.     In response to Love's characterization of the sanctions against John, John filed a retaliation claim against Laboratory faculty for taking adverse action against John in violation of CS-20 and the University's Statement on Confidentiality and Non-Retaliation in Connection with Investigations.

98.     On or about July 19, 2023, John met with Stevvaie Brown, Civil Rights and Advocacy Response Manager, and Love to discuss his complaint. John also raised concerns about the ongoing investigation of allegations made against John.

99.     At the conclusion of the meeting, Love told John that she would contact John by the following week to discuss next steps.

100.     On August 3, 2023 and several days after Love advised that she would contact John, John emailed Love to request information on how to proceed. Love responded, stating that the complaint John filed would be handled by the CIE Office. As related to the investigation into allegations against John, Love told John that he was not entitled to view the investigation report. In response, John expressed frustrations with the lack of clarity throughout the investigation, as well as the delay in being notified about the investigation's outcome, a violation of Title IX. Love did not reply.

101.     On August 11, 2023, John sent another email to Love, as she had yet to respond to John's previous email. That same day, Stevvaie Brown contacted John to schedule a meeting with John and Love.

102.    On August 16, 2023, John spoke with Love who advised him that the chair of the University department in which John was formerly employed was tasked with signing the outcome letter but refused to do so.

103.    On August 21, 2023, John emailed Love requesting that the outcome letter be provided to him without a signature. Love responded that the letter must have a signature and that she was "working with other departments to determine the best way to proceed."

104.    On September 26, 2023, nearly 1 year after first being notified about the investigation, John received an outcome letter. The letter stated, "the investigation determined that you engaged in an inappropriate relationship with an undergraduate student, while working in the University's [redacted] Labs, in violation of the University's Consensual Relationship Policy (CS 02)."

105.    The letter was authored and signed by James Gallaher, Vice Chancellor of Human Resources.

106.    John never received notice that he was under any investigation related to Policy CS-02.

107.    The term "inappropriate relationship" is not defined in University policies.

108.    Upon information and belief, the basis of the finding that John engaged in an "inappropriate relationship" with Jane was due to the erroneous belief/finding that John supervised Jane.

109.    John never performed any supervisory function related to Jane's employment.

110.    The letter continued, stating that, "the investigation also determined that you committed multiple forms of relationship violence, in violation of the University's Sexual Misconduct Policy (CS 20)."

111.    Alleged relationship violence and physical abuse, in and of themselves, triggers the University's obligations under Title IX.

112.    The term relationship violence is not defined in University policies.

113.    The outcome letter does not contain any rationale related to the investigation's determinations.

114.    There is no evidence to support a conclusion that John engaged in any form of sexual harassment, or any other type of abuse.

115.    The outcome letter is silent as to the exact conduct John was alleged to have committed, or the exact conduct John was found to have committed.

116.    To date, the University has never informed John of the specific conduct constituting allegations of abuse or "relationship violence."

117.    The language of the outcome letter is inconsistent with the alleged policy violations contained in the Notice of Investigation Letter provided to John.

118.    The outcome letter indicated that John was being designated a Persona Non-Grata and explicitly barred him from University property under threat of arrest.

119.    The outcome letter indicated that John would not be considered for future employment with the University.

120.    On September 27, 2023, John emailed Gallaher to ask multiple questions and obtain information John had been deprived of to that point including but not limited to the alleged conduct that formed the basis for Jane's allegations of "abuse" and the alleged conduct that formed the basis for the University's findings of "relationship violence." This information was critical for John to appeal investigation findings. Gallaher replied the next day to inform John that Gallaher would work with the CIE Office to respond to John's questions.

121.    On October 9, 2023, John timely submitted his appeal within the 10-day window provided by the University.

122.    On October 10, 2023 and after the deadline for submitting an appeal, Heidel replied to refer John to Love regarding requests for information.

123.    On October 11, 2023 and after the deadline for submitting an appeal, Gallaher finally replied with incomplete and, in some cases, factually incorrect responses to John's questions, in what appeared to be a purposeful delay.

124.    On February 6, 2024 (120 days after John submitted his appeal), the University had still not ruled on John's appeal. On that same day, John emailed David DeJong, Senior Vice Chancellor for Business and Operations; Joseph McCarthy, Interim Provost and Senior Vice Chancellor; and Geovette Washington, Chief Legal Officer. In this email, John restated the University's repeated failures to abide by its own policies and federal law. Read receipts were provided by all individuals, but none responded to John's email.

125.    On February 9, 2024, Assistant Vice Chancellor for Operational Excellence, Victoria Lancaster emailed John to notify him that his appeal was believed to be spam and was never opened.

126.    On April 18, 2024 (192 days after John filed his appeal), John received a letter from the University via email stating, "the board found that the appeal did not fall within any of the three limited ground and should be denied."

127.    The appeal letter was authored by David DeJong.

### University of Pittsburgh's Culture of Male Discrimination

128.    The unlawful, differential, and discriminatory treatment of John was all based on a deeply rooted atmosphere and culture at University of Pittsburgh in discriminating against males

in the University disciplinary process, avoiding due process rights, and assuming that males are common perpetrators of sexual misconduct.

129.    The University of Pittsburgh has a full webpage dedicated to "supporting survivors." The web page is titled, "Pitt Supports Survivors." https://www.diversity.pitt.edu/pitt-supports-survivors

130.    Contained on this webpage are statements from University staff and students, many of which claim to believe all survivors. *Id.*

131.    University of Pittsburgh participates in an event "Pittsburgh Universities Believe Survivors March."

132.    University of Pittsburgh provides "Trauma Informed Engagement Training," which is "developed to provide community members with skills to help them engage with the Pitt community using a trauma-focused approach." https://www.diversity.pitt.edu/campus-sexual-assault-awareness-month

133.    University of Pittsburgh hosts, "Trauma Informed Yoga," which is advertised as a "hands-free, gentle yoga class for survivors of sexual violence and supporters." *Id.*

134.    Through its online postings, messaging to the University community as a whole, and programming, Defendants have adopted and encouraged the belief that:

    a. Sexual misconduct allegations are rarely made up and are therefore always legitimate;

    b. Men are often perpetrators of sexual misconduct;

    c. Women are often victims of sexual misconduct; and

    d. People, including University staff, should start by believing.

135.    These discriminatory beliefs led Defendants to:

a. Ignore Jane's credibility issues, including her delayed reporting and motive to be untruthful;

b. Ignore John's documented evidence proving that Jane's allegations were not credible;

c. Engage in several and severe procedural irregularities, all of which were ignored in an effort to find John responsible;

d. Proceed under the incorrect policy for the sole purpose of stripping John of due process rights and any meaningful opportunity to defend himself; and

e. Erroneously conclude that John was responsible for University policy violations.

## COUNT I

**Discrimination in Violation of Title IX of the Education Amendments of 1972
(University of Pittsburgh)**

136.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

137.    Defendants' disciplinary proceedings against John, as detailed above, violated Title IX of the Education Amendments of 1972 and/or subsequent regulations.

138.    Defendants discriminated against John and deprived him of the benefits of its education program through its discriminatory, sex-based implementation of its disciplinary process, and by sanctioning him as a result of that process.

**A. Starting in 2011, the federal government pressured educational institutions to provide more protection to students alleging sexual misconduct and harassment, focusing on protection of women.**

139.    In the years leading up to the incident in question, colleges in the United States, including University of Pittsburgh, have been subjected to pressure from the federal government,

the public, and members of college communities to take campus sexual misconduct more seriously, provide more protection to purported victims, and crack down on purported offenders.

140.    On April 4, 2011, the Office of Civil Rights in the U.S. Department of Education ("OCR") issued a "significant guidance document" commonly referred to as the 2011 "Dear Colleague Letter." Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Apr. 4, 2011) at n.1, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter").

141.    Although the letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See Administrative Procedure Act, 5 U.S.C. § 553.

142.    The press release announcing the letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence," and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college"; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages." *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence (Apr. 4, 2011),*

https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administrationeffort-help-nations-schools-ad.[2]

143.    The 2011 Dear Colleague Letter itself explicitly focused on protection of women, repeating the claim that "about 1 in 5 women are victims of completed or attempted sexual assault while in college" and stating that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol." *2011 Dear Colleague Letter* at 2 & n.3.

144.    The 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation; similar and timely access to any information that will be used at the hearing; and adequately trained factfinders and decision makers. *Id.* at 9-11.

145.    The letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent.

146.    Among other things, the 2011 Dear Colleague Letter directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant" (*id.* at 12); directed schools to take interim steps to protect complainants and "minimize the burden on the complainant" (*id.* at 15-16); "strongly discourage[d]" schools from allowing cross-examination of parties (*id.* at 12); and urged schools to focus on victim advocacy (*id.* at 19 n.46).

---

[2] *Supra* note 2.

147.    The 2011 Dear Colleague Letter also stated that schools "must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)," and must not use the "clear and convincing standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred)." *Id.*

148.    Given the fact that campus disciplinary proceedings lack key procedural protections provided in court litigation (including discovery, the right to active representation by counsel, rules of evidence, and independent judges and juries to make decisions), the existence of other governmental and public pressure discussed in more detail below, and the severe and lasting consequences of a finding of responsibility for sexual misconduct, the preponderance standard does not adequately protect accused students' rights.

149.    Even though the 2011 Dear Colleague Letter purports to be a "guidance" document and did not go through rulemaking procedures, OCR framed many of its directives, including the directive to use the preponderance of the evidence standard, as mandatory.

150.    Moreover, the 2011 Dear Colleague Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." Id. at 16.

151.    The overriding purpose of the 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the *Brandeis* court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic

26

procedural protections—and the substantially increased risk that innocent students will be punished." *Id.*

152.    The 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual misconduct proceedings as OCR wanted. *See How Sexual Assaults Came to Command New Attention*, NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention

153.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual misconduct, to adopt procedures that do not safeguard the rights of the accused, and to train officials to start with the presumption that an accused student is responsible, all with a focus on protection of women.

154.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."   In addition, OCR advised schools to give employees and students "trauma-informed" training and said "hearings should be conducted in a manner that does not inflict additional trauma on the complainant." Questions and Answers on Title IX and Sexual Violence, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

155.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students

from sexual violence." *Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault*, at 2, https://www.justice.gov/ovw/page/file/905942/download.

156.    The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding. *Id*. at 2, 17.

157.    Among other things, the Task Force supported the use of a single investigator model, which generally involves one school official serving as investigator, prosecutor, and decision maker and severely limits the respondent's ability to challenge the complainant's account.  *Id*. at 3, 14.

158.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." *Id*. at 3.

159.    The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs. *Id*.

160.    Ultimately, the Department of Justice funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." *End Violence Against Women International, Effective Report Writing: Using the Language of Non-Consensual Sex*,  at  6,  http://evaw.threegate.com/Library/DocumentLibraryHandler.ashx?id=43; *see also*

*Campus            Action            Kit,            Start            by            Believing*,
https://www.startbybelieving.org/wpcontent/uploads/2019/08/Campus-Action-Kit.pdf.

161.   Among other things, "Start by Believing" training directs investigators to:

a.   "recreate the entire reality of the sexual assault <u>from the perspective of the victim</u>";

b.   focus on evidence and statements that "corroborate the victim's account";

c.   include details not just about what happened, but about "what the victim was thinking and feeling," in order to create a "word picture" that "better support[s] prosecution";

d.   "replace neutral words such as 'said,' 'told,' or 'asked'" with more "descriptive" words – e.g., say the "victim" "begged" or "pleaded," and the "suspect" was

"ordering," "insisting," or "demanding";

e.   "describ[e] all of the elements that contributed to the victim's experience of force, threat, or fear";

f.   "always use the language of non-consensual sex"; i.e., instead of "terms that convey positive, mutual interactions such as 'sexual intercourse' [or] 'oral sex,'" "it is sometimes appropriate to use terminology from the penal code, such as 'rape' or 'sexual assault,'" or, alternatively "simply describe the parts of the body and the things the victim was forced to do with those parts of the body";

g.   "highlight implausible, absurd, and/or changing explanations provided by the suspect regarding what happened";

   h.   "try to anticipate potential defense strategies and include the evidence and
        information necessary to counter these strategies"; and

   i.   "ensure that . . . reports include all of the evidence required to prove the
        elements of the offense and refute the likely defense, which in most sexual
        assault cases is going to be consent."

*Effective Report Writing: Using the Language of Non-Consensual Sex*, at 5, 7, 8, 10, 11, 12, 14, 23, 30 (emphasis original).

   162.   In sum, "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'" *Effective Report Writing: Using the Language of Non-Consensual Sex*, at 37.

   163.   The online postings, messaging, and programming offered by University of Pittsburgh encourages the belief that individuals should "start by believing."

   164.   In February 2014, Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them"; that school officials and she as "chief enforcer" needed to "radically change that message"; and that "if you don't want to do it together, I will do it to you." *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of

Higher    Education    (Feb.    11,    2014),    https://www.chronicle.com/article/Colleges-Are-Remindedof/144703.

165.    According to the Chronicle of Higher Education, college officials understood they had been given "crisp marching orders from Washington" to follow OCR's directives. *Id.*

166.    On May 1, 2014, as part of its aggressive enforcement policies following the 2011 Dear Colleague Letter, OCR published a list of 55 higher education institutions nationwide that were then under investigation for possible Title IX violations. *U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations* (May    1,    2014),    https://www.ed.gov/news/press-releases/us-department-education-releases-listhigher-education-institutions-open-title-ix-sexual-violence-investigations.

167.    According to the Chronicle of Higher Education, that number eventually grew to over 500. *Title IX, Tracking Sexual Assault Allegations,* Chronicle of Higher Education, https://projects.chronicle.com/titleix/.

168.    The sharp increase in the number of investigations – the overwhelming majority of which have involved alleged violations of the rights of complaining students, almost always female – was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result.

**B.   In response to government and public pressure, colleges and universities across the nation have adopted Title IX policies and procedures that are "victim"-centered and fundamentally unfair to accused individuals.**

169.    The threats and pressure from OCR have forced colleges and universities to change their policies, since virtually all colleges and universities in the country receive federal funding.

170.    In response to the federal government's directives and enforcement activities, schools across the nation have adopted special policies for disciplinary proceedings involving

31

alleged sexual misconduct. The policies are administered by designated officials and include investigatory and decision-making processes, evidentiary standards, and appeal processes based on OCR's actual and perceived requirements. In many instances, the policies and processes offer accused students significantly less protections than students receive in other campus disciplinary matters, including matters involving allegations of serious non-sexual misconduct.

171.    In their policies for adjudicating Title IX complaints, many schools have gone even further than OCR's specific directives in adopting procedures favoring alleged victims (the great majority of whom are female) and essentially eliminating fair process protections for respondents (the great majority of whom are male).

172.    Following the model of the federally-funded "Start by Believing" campaign, schools routinely train their officials to apply trauma-informed and "#BelieveWomen" approaches in ways that lead them to presume that an alleged assault occurred, that a complainant's account of an incident must be true, and that a complainant's subjective impressions determine whether conduct is sexual harassment or assault. Students are suspended or expelled without meaningful notice or opportunity to be heard and are left with records that permanently brand them as sexual offenders, devastate them personally, and severely impact their educational and career opportunities.

173.    The same kinds of training and guidance go to other members of the college community, and in this age of social media and the internet, the mere mention of a sexual misconduct accusation can have the same negative and ongoing effects as a finding of responsibility, even if the accused is exonerated.

174.    "Because the changes to the process were impelled in large part by the federal government, the issues presented [in any particular case] are not entirely unique, and not confined to a single campus." *Brandeis*, 177 F. Supp. 3d at 572.

175.    Numerous groups and organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to find students accused of sexual misconduct (who are overwhelmingly male) responsible, in spite of the evidence or the lack of evidence.  (*See, e.g.*, Foundation for Individual Freedom in Higher Education (FIRE), Stop Abusive and Violent Environments (SAVE), Families Advocating for Campus Equality (FACE), and prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due process rights of the accused.)

176.    In the words of a judge considering college disciplinary procedures that "appear[] to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process:" "it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision. Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Brandeis*, 177 F. Supp. 3d at 573.

177. Other federal and state courts, as well as some state legislators and university officials, have similarly expressed concerns that efforts to redress longstanding social problems are resulting in unfair processes and results in individual Title IX proceedings.

178. On September 3, 2014, NPR published an article titled, "Some Accused Of Sexual Assault On Campus Say System Works Against Them." Here, the University of Maine's Dean Robert Dana recognized that federal pressure made universities rush to judgment on individual allegations, stating, "I expect that that can't help but be true. Colleges and universities are getting very jittery about it." https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them#:~:text=this%20one!'-,%22,getting%20very%20jittery%20about%20it.%22

179. In reminiscing about the pressure applied to colleges and universities under the Obama administration, former Office of Civil Rights lawyer Jackie Gharapour admitted, "We did see some bad cases in the Obama era, cases where it basically didn't matter what evidence there was. The college was going to find against the defendant, the male defendant, no matter what. I think the schools felt pressure under the Obama guidance." https://www.realclearinvestigations.com/articles/2020/12/15/bidens_pushing_ahead_to_the_obama_past_on_campus_rape_hell_need_good_luck_with_that_126353.html?fbclid=IwAR229kxedzNe_pkf7AiQOAmv1XX8O3SMPPs93RFq1wDodqLnudEIqRUc2ow

180. Similarly, Association of Title IX Administrators ("ATIXA") president, Brett Sokolow recalled that, "the problem of biased outcomes was real. Educational institutions railroaded those accused of sexual violence and harassment (mostly cisgender men) in numbers that should terrify any reasonable person."

https://www.insidehighered.com/views/2022/07/12/flexibility-title-ix-regs-blessing-and-curse-opinion

**C. Starting in 2017, the Department of Education has modified its approach to Title IX enforcement, focusing on fairness to all parties.**

181.    In guidance documents issued on September 22, 2017, the Department of Education expressed concern that many schools have established procedures for resolving allegations that "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'" Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, provided guidance on procedural protections necessary for a fair, reliable process. 2017 Q&A, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

182.    On November 29, 2018, the Department published new proposed regulations for public review and comment. *Nondiscrimination on the Basis of Sex in Education Programs or Activities        Receiving        Federal        Financial        Assistance*, https://www.federalregister.gov/documents/2018/11/29/2018-25314/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal.

183.    The proposed regulations represented the Department's effort to align Title IX regulatory requirements with basic principles of justice and court rulings requiring that people accused of serious misconduct receive notice, a fair hearing before unbiased decision makers, and a presumption of innocence. *Id.*

184.    The proposed regulations set forth specific procedural protections including:

     a.  Provisions requiring schools to provide adequate notice of allegations and their applicable procedures, conduct full and fair investigations, collect, and

objectively evaluate both exculpatory and inculpatory evidence, create investigative reports that fairly summarize relevant evidence, provide fair hearings in front of unbiased decisionmakers (who cannot be the same people as the investigator(s)), and give respondents a presumption of non-responsibility.

b. Provisions requiring schools to allow both parties to review all the evidence related to the allegations (not just evidence the school considers relevant or intends to rely on), so that the parties can meaningfully respond to the evidence before the investigation concludes.

c. Provisions requiring schools to train officials to conduct impartial proceedings, not to rely on sex stereotypes, and not to base credibility decisions on a party's status as complainant or respondent.

d. Provisions requiring colleges and universities to provide a live hearing and allow advisors to the parties to cross-examine the other party and witnesses.

185.    The proposed regulations confirmed that "[a school's] treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX" and that "[a school's] treatment of the respondent may also constitute discrimination on the basis of sex under title IX." Proposed 34 C.F.R. § 106.45.

186.    On May 7, 2020, the Department of Education announced the final Title IX regulations. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (to be published in the Federal Register; unofficial text available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf).

187.    Under the final regulations: "A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44(a), as amended.

188.    Section 106.45(b) sets forth the specific requirements for a formal grievance process.

189.    The Department repeatedly emphasized that the protections it mandated are rooted in longstanding principles of due process and fundamental fairness and apply to both private and public institutions. "[A]s the Department has recognized in guidance for nearly 20 years, Title IX rights must be interpreted consistent with due process guarantees." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, Supplementary Information, at 276.

190.    Section 106.45(a) confirms that a school's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."

191.    As the Department explained: "In every case in which Title IX sexual harassment is alleged, the facts must be resolved accurately to further the non-discrimination mandate of Title IX, including providing remedies to victims and ensuring that no party is treated differently based on sex. . . . The [regulatory] grievance process aims to provide both parties with equal rights and opportunities to participate in the process, and to promote impartiality without favor to complainants or respondents, both because treating a complainant or respondent differently based on sex would violate Title IX, and because a process lacking principles of due process

risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." Supplementary Information, at 220, 277.

**D. University of Pittsburgh's Response to the Proposed 2020 Regulations.**

192.    On January 30, 2019, the University submitted comments on the Notice of Proposed Rulemaking outlining changes to the regulations under Title IX.

193.    Through these comments, the University made its goal of protecting survivors, discriminating against males, and stripping the accused of due process rights well known.

194.    In its comments, the University of Pittsburgh discouraged the use of live hearings, cross-examination, and evidentiary rulings.

195.    The University complained that the proposed rule does not take into consideration a "trauma-informed approach."

196.    A "trauma-informed approach" is well-known as being accuser friendly by failing to explore credibility or other issues. Instead, one is taught to believe all accusers.

**E. Pressure applied to University of Pittsburgh directly.**

197.    In addition to the pressure that has been applied to colleges and universities generally since the 2011 Dear Colleague Letter, University of Pittsburgh has been subjected to specific pressure and criticism regarding its handling of sexual assault, and in particular, pressed to do more to protect female "survivors" and punish male "perpetrators."

198.    On November 29, 2017, Pitt News published an article that stated, "Bringing women's voices to the forefront of the conversation the way the #MeToo movement does is important — but even more necessary is holding the men who create such a toxic culture accountable.    https://pittnews.com/article/125309/opinions/considering-language-around-assault/

199.    On February 8, 2018, Pitt News published an article titled, "Saying #MeToo in the streets, not just the tweets," wherein the author recapped Tarana Burke's speech at University of Pittsburgh.    https://pittnews.com/article/127470/opinions/saying-metoo-streets-not-just-tweets/

200.    The article stated that Burke, the founder of the #MeToo movement, "emphasized that intersectional feminism is more nuanced than what Twitter users might have you believe. Content claiming to be intersectional appearing on the internet often seems more divisive than inclusive. Understanding privilege and standing up for issues that might not impact oneself are obviously important, but the term has been used to undermine significant movements for women's rights — including the Women's March."

201.    The article also highlighted the number of clubs designed for women at the University, such as "the Campus Women's Organization, Female Empowerment Movement and Strong Women Strong Girls, who were all present at the event."

202.    On March 28, 2018, Ms. Magazine published an article titled, "Accountability is Finally Coming to Academia in the Midst of #MeToo." https://msmagazine.com/2018/03/28/accountability-finally-coming-academia-midst-metoo/

203.    The article discusses an investigation conducted by the University of Pittsburgh, which allegedly "uncovered numerous incidents of sexual harassment and discrimination, as well as an alarming number of sexual relationships between faculty and students."

204.    The article featured a statement from Kathleen Blee, you admitted that the Department of Communication had "a consistent pattern in which women were not as valued and respected as their male colleagues," which "resulted in an environment in which the inappropriate acts of the few were tolerated by the silence of others."

205.    On December 9, 2022, Pitt News published an article titled, "I've reached out numerous times: Student leaders disappointed with University communication on campus sexual violence."

206.    The article was written to criticize the University of Pittsburgh for its handling of an alleged sexual assault by a male against a female.

**F. Pro-"victim" bias violates Title IX.**

207.    Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men.

208.    Indeed, as noted above, efforts to provide more protections to reported victims of sexual misconduct have consistently focused on protection of women.

209.    As the new Title IX regulations confirm, any approach under which accused people are presumed guilty or deprived of the ability to defend themselves, or individual cases are resolved without full and fair consideration of the facts of each case, is contrary to this nation's fundamental principles and contrary to Title IX and the Clery Act's requirements of a "prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa); *see also* 34 C.F.R. 106.8(b) and 45 C.F.R. § 86.8(b) (quoted above).

210.    In the words of Justice Ruth Bader Ginsburg, fair process for the accused "must not be ignored and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself, and we certainly should not lose sight of that. Recognizing that these are complaints that should be heard. There's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of our system, as you know, everyone deserves a fair hearing." Asked how to "balance the values

of due process against the need for increased gender equality," Justice Ginsburg replied: "It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally." Jeffrey Rosen, *Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials*, The Atlantic (Feb. 15, 2018), https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-upabout-metoo-voting-rights-and-millenials/553409/.

211.    That measures to protect reported victims are generally equated with protection of women, and measures to ensure a fair process for respondents are generally equated with protection of men, has been starkly confirmed by responses to the Department of Education's 2017 guidance and its proposal in 2018 to amend Title IX regulations to ensure a fair process for both complainants and respondents.

212.    Over 100,000 comments were filed to the proposed regulations, with a common theme being allegations that the Department's efforts to restore fair processes in campus disciplinary proceedings were motivated by bias against women and disproportionately burden women.

213.    To avoid sex discrimination, campus disciplinary proceedings should be fundamentally fair to all participants: complainants and respondents, regardless of sex.

**G. University of Pittsburgh's investigation and adjudication of allegations against John violated Title IX.**

214.    The complaint against John alleged that, while John was employed with the University, he engaged in a relationship with an undergraduate student whom he supervised. The complaint also alleged that, while John was employed with the University, he engaged in sexual harassment of the student he was dating, specifically physical, emotional, and academic abuse.

215.    The allegation described from the notice of investigation letter addressed to John categorically alleges sexual harassment that occurred within the University's education program, requiring the investigation to proceed under the University's Title IX policy.

216.    University of Pittsburgh reached an erroneous outcome, selectively enforced its disciplinary procedures, applied archaic assumptions, and acted with deliberate indifference based on John's sex. Among other things, as set forth above, University of Pittsburgh violated John's Title IX and constitutional rights when it willfully failed to employ and abide by the policies and procedures outlined in University Policy CS-27.

217.    Instead, the University purposefully employed an unfair and sham-like process, the goal of which was not to ascertain the truth of the allegations, but rather, to find males responsible for policy violations.

218.    John's case is part of a pattern and practice of Title IX violations and discrimination against males accused of sexual misconduct.

219.    As a direct, proximate, and foreseeable consequence of Defendants' violations of Title IX, John sustained significant damages, including, but not limited to damages to his reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

220.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II

**Violation of the Due Process Clause of the 14th Amendment to the United States Constitution, Pursuant to 42 U.S.C. §§ 1983, 1985, 1988 (Against the Individual Defendants, in their Individual Capacities)**

221.    John repeats and realleges each and every allegation set forth above as if fully rewritten herein.

222.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

223.    A person has a protected liberty interest in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

224.    John's constitutionally protected property interest in his good name, reputation, and prospective employment are to be free from arbitrary adverse action arising from the policies, courses of conduct, practices, and process set forth by University of Pittsburgh.

225.    John's constitutionally protected property interest in his employment arise from the express and implied contractual relationship between University of Pittsburgh and John.

226.    The Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings such as at the University of Pittsburgh.

227.    The Commonwealth of Pennsylvania cannot deprive a person of these interests without due process.

228.    As a result, John, who was subjected to disciplinary action that could impact his good name, reputation, and employment, if found responsible, is entitled to the due process protections of the Fourteenth Amendment to the United States Constitution.

229.    At all times, John was also entitled to federal rights under Title IX. These rights are contained throughout this Complaint.

43

230.     At all times relevant, each Defendant knew of John's federal rights under Title IX.

231.     Defendants, as a public university, have a duty to provide students, faculty, and employees equal protection and due process of law by and through any and all policies and procedures set forth by the University of Pittsburgh.

232.     Under both federal and state law, John had a constitutionally protected interest in his good name, reputation, and future employment.

233.     John was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this matter resulted in a sanction that will have lifelong ramifications for John, including loss of future wages.

234.     John was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct involving Jane.

235.     In the course of its investigation process, Defendants knowingly, flagrantly, willfully, and maliciously violated John's clearly established rights under the Due Process Clause of the Fourteenth Amendment through the Defendants' repeated acts of deprivation of the minimal requirements of procedural fairness.

236.     Defendants deprived John of his liberty and property interests without affording him basic due process, including but not limited to, his right to a fair and impartial adjudication, and to a meaningful opportunity to be heard by those making the decision on credibility, and ultimately, responsibility. Rather than provide a fundamentally fair process, Defendants conducted a result driven process aimed at finding men responsible of sexual misconduct.

237.    Based on the general bias expressed throughout the University and implicit in its policies and procedures, Defendants subjected John to an insufficient process when it failed to provide John with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary, and unwarranted decision.

238.    As a result, Defendants failed to provide John with the basic due process protections that Defendants are required to provide.

239.    Defendants were acting under the color of the law when they showed intentional, outrageous, willful, and reckless disregard for John's constitutional rights.

240.    University of Pittsburgh, as well as its agents, representatives, and employees agreed to, approved, and ratified this unconstitutional conduct.

241.    As a result of these due process violations, John continues to suffer ongoing harm, including damage to his reputation, eventual loss of employment, and other non-economic and economic damages.

242.    The University exacerbated this harm by informing others, including, but not limited to, John's employer, of John's alleged conduct, in violation of its own policies and John's due process rights.

243.    In doing so, University of Pittsburgh created and disseminated a false and defamatory impression about Plaintiff.

244.    As a direct and proximate cause of Defendants' actions, John suffered tremendous damage to his person and reputation, including without limitation, emotional distress, loss of future employment, economic damage, and other direct and consequential damages.

245.    John is entitled to injunctive relief as a result of the deprivation of his due process and equal protection rights. Preliminary injunction should return the status quo before the controversy at issue, with John being removed from the University's persona non grata list.

## COUNT III

**Breach of Contract**
**(Against University of Pittsburgh)**

246.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

247.    At all relevant times, a contractual relationship existed between John and University of Pittsburgh.

248.    The promises contained in University of Pittsburgh's Policies and Procedures are legally binding obligations.

249.    Defendants were required to act in accordance with the University's written policies and procedures in investigating and adjudicating reports of alleged policy violations.

250.    Based on the facts and circumstances set forth in this Complaint, Defendants materially breached its express and/or implied agreements with Plaintiff by failing to comply with its obligations, standards, policies, and procedures in the course of the disciplinary proceedings against Plaintiff, and by subjecting him to fundamentally unfair processes.

251.    In its Policy and Procedures, University of Pittsburgh promises, among other things, that it will:

    a.  Follow the procedures of CS-27 when appropriate;

    b.  Allow Plaintiff/Respondent a meaningful opportunity to be heard;

    c.  Objectively evaluate evidence;

    d.   Avoid making disciplinary decisions, including credibility determinations, based on a person's status as a complainant, respondent, or membership in a protected class, such as gender;

    e.   Attempt to interview all relevant witnesses;

    f.   Allow Plaintiff/Respondent to review and respond to all evidence and witness statements collected;

    g.   Timely adjudicate disciplinary matters, or, at the very least, notify the parties of the delay and reason for delay;

    h.   Conduct a live-hearing with cross-examination;

    i.   Prohibit irrelevant evidence from being considered;

    j.   Correct any errors in the investigation and/or adjudication process through an appeal; and

    k.   Keep the investigation and adjudication of complaints confidential.

252.   Defendants materially breached its obligations when, among other things, it:

    a.   Did not afford John a meaningful opportunity to be heard;

    b.   Did not provide John copies of relevant University Policies and Procedures per the same Policies/Procedures;

    c.   Did not notify John in advance of the single interview he was given of who made the claims against him for conduct that allegedly occurred 4 years prior;

    d.   Did not notify John of the conduct constituting the allegations of abuse despite his repeated attempts to obtain this information from multiple Defendants throughout the investigation and appeals process;

e.  Did not allow John to review or respond to the evidence or witness statements collected;

f.  Did not conduct a live hearing;

g.  Did not follow any portion of the CS-27 Policy and/or Procedure, opting instead to proceed with CS-20.

253.  Defendants materially breached its Policy when it purposefully, with the sole intent of stripping John of basic due process rights, proceeded under the incorrect policy.

254.  Defendants materially breached its Policy when it failed to correct the material procedural errors and clearly erroneous outcome on appeal.

255.  John fully complied with his contractual obligations to the University of Pittsburgh.

256.  As a direct, proximate, and foreseeable consequence of Defendants' breach of its express and/or implied contractual obligations, John sustained significant damages, including, without limitation, damage to reputation, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

257.  As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV

**Defamation**
**(Against Laurel Gift and John Roes 1-5)**

258.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

259.     During the course of the investigation and/or adjudication, Defendants Gift and John Roes 1-5 made statements to John's employer. Within these statements, Defendants made a series of false, defamatory utterances, statements, writings, and publications about John.

260.     These statements included utterances, statements, writings, and publications that John engaged in relationship violence and/or other forms of abuse against Jane, and that John had an inappropriate relationship with Jane.

261.     At all material times, Defendants acted intentionally and knew, or were at least reckless in the fact, that the statements were false.

262.     The false utterances, statements and/or publications by Defendants were made with willful and reckless disregard of the consequences, with callous disregard for John's rights and physical and mental well-being, with legal malice, and with substantial certainty that the consequences thereof would cause serious personal injury to John.

263.     The false utterances, statements, writings and/or publications were injurious to John.

264.     Defendants' utterances, statements, writings, and/or publications constitute defamation *per se* because such statements accuse John of a crime, as well as professional and sexual misconduct.

265.    As a direct, proximate, and foreseeable consequence of Defendants' actions, John sustained significant damages, including, without limitation, damage to reputation, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

266.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe respectfully requests that this Honorable Court:

(a)    Order University of Pittsburgh to reverse and expunge its findings of responsibility and sanctions from John's records;

(b)    Order University of Pittsburgh to provide a Dean's Certification that shall be made available to third parties (such as educational institutions and prospective employers) certifying that it has reversed and expunged the findings and sanction;

(c)    Award John compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages;

(d)    Award prejudgment interest;

(e)    Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award; and

(f)    Grant such other and further relief that the Court deems just and proper.

Respectfully Submitted,

*/s/ Eric F. Long*
ERIC F. LONG (pending pro hace vice admission)
TYLER J. WALCHANOWICZ (pending pro hac vice admission)
Counsel for Plaintiff
Friedman, Nemecek Long & Grant, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44114
P: (216) 928-7700
F: (216) 820-4659
E: efl@fanlegal.com
E: tjw@fanlegal.com