# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN DOE,                                             )
                                                      )    No. 2:25-00641
          Plaintiff,                              )
                                                      )
          v.                                      )    Judge Robert J. Colville
                                                      )
UNIVERSITY OF PITTSBURGH, *et al.*,                   )
                                                      )
          Defendants.                             )
                                                      )
                                                      )

## MEMORANDUM ORDER

Robert J. Colville, United States District Judge

       Before the Court is a Motion to Proceed Under Pseudonym (ECF No. 4) filed by Plaintiff, a Motion to Dismiss (ECF No. 20) filed by Defendants, and a Motion for Oral Argument (ECF No. 27) filed by Plaintiff. Plaintiff, proceeding under the pseudonym John Doe, brings this action against University of Pittsburgh of the Commonwealth System of Higher Education ("University Defendant" or the "University," as appropriate), along with individual University administrators and staff Laurel Gift, Kristi Heidel, Vanessa Love, James Gallaher, David DeJong, and John Roes 1–5 (collectively "Individual Defendants," and, along with University Defendant, "Defendants"). Defendants move to dismiss all counts in Plaintiff's Complaint (ECF No. 1), arguing that Plaintiff has failed to state a claim upon which relief can be granted. The Court has subject matter jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1331. The Motions have been fully briefed and are ripe for disposition.

I.    **Factual Background & Procedural History**

   A.  **Plaintiff's Allegations**

In the Complaint, Plaintiff sets forth the following factual allegations relevant to the Court's consideration of the Motions at issue:

In October 2016, Plaintiff was hired as a postdoctoral trainee at University of Pittsburgh. ECF No. 1 ¶ 18. During the summer of 2017, Plaintiff met Jane Roe, an undergraduate student who had a summer job with the University, and the two developed a romantic relationship. *Id.* ¶¶ 17–23. Plaintiff took no part in hiring Ms. Roe and had no supervisory role respecting her employment. *Id.* ¶¶ 21–22. In the fall of that year, the University hired Ms. Roe to work alongside Plaintiff. *Id.* ¶ 29. In the summer of 2018, Ms. Roe moved out of state to attend graduate school. *Id.* ¶ 32. The two attempted to maintain their relationship long distance, but not long after Ms. Roe left Pittsburgh, it came to an end. *Id.* ¶ 33.

 In the fall of 2018, Plaintiff received notice from a University faculty member that several complaints were received from one of the laboratories respecting Plaintiff's behavior, and instructed Plaintiff to stop interacting with members of that lab. *Id.* ¶ 36. The University took no punitive actions against Plaintiff at that time. *Id.* ¶ 37.

In the summer of 2020, Plaintiff's position with the University ended, but he maintained a working relationship with lab faculty, to assist with projects and collaborate on analyses. *Id.* ¶ 38. In the fall of 2022, Plaintiff was notified by the University's Office of Compliance, Investigations & Ethics (the "CIE Office") that it had learned that in 2017 and 2018 Plaintiff had engaged in a romantic relationship with an undergraduate student under his supervision, which involved sexual harassment of that student, including academic, emotional, and physical abuse, in violation of the

University's Sexual Misconduct Policy.[1]  *Id.* ¶¶ 39–40.  The University indicated that it would investigate the allegations against Plaintiff.  *Id.* ¶ 40.  The letter to Plaintiff was signed by Individual Defendant Laurel Gift, Assistant Vice Chancellor for Compliance, Investigations & Ethics. *Id.* ¶ 44.

After receiving the letter, Plaintiff contacted Individual Defendant Kristi Heidel, the investigator assigned to the accusations against Plaintiff.  *Id.* ¶ 68.  Plaintiff asked Ms. Heidel who had made the accusations and who was aware of them, but she was unable to provide that information to Plaintiff.  *Id.* ¶ 69.  Plaintiff then emailed Ms. Gift asking for the identities of the accuser and others who knew of the allegation against him.  *Id.* ¶ 70.  In her email response, Ms. Gift mentioned that the University had notified Plaintiff's employer of the allegations.  *Id.*

In November 2022, Ms. Heidel interviewed Plaintiff respecting the accusations Plaintiff had learned from the lab faculty member in the fall of 2018, his relationship with Ms. Roe, the pending allegations against him, and the resulting investigation.  *Id.* ¶ 70.  Plaintiff asked for a recording of the interview, which Ms. Heidel did not provide.  *Id.*  Plaintiff provided answers, and furnished letters from Ms. Roe in which she expressed positive feelings about Plaintiff.  *Id.* ¶¶ 76–79.  Ms. Heidel never asked Plaintiff for details about any alleged events of abuse, and when Plaintiff offered to provide further documentation of the consensual nature of his relationship with Ms. Roe, Ms. Heidel seemed disinterested and never followed up for additional details.  *Id.* ¶¶ 79–84.

---

[1] It is unclear to the Court if these communications from the University were conclusory accusations that Plaintiff had in fact engaged in these activities, or that the quote that Plaintiff inserts into the Complaint ("during the 2017-2018 academic year, you engaged in a romantic relationship with an undergraduate student whom you supervised. During the course of that relationship, you engaged in forms of sexual harassment of that student, including academic, emotional, and physical abuse.") is an excerpt from a portion of the letter where the University described the allegations made by a third party against Plaintiff.  ECF No. 1 ¶ 39.

In early March 2023, Plaintiff followed up with Ms. Heidel about the status of the investigation. *Id.* ¶ 85. Ms. Heidel responded that the report was nearly complete. *Id.* Later that month, Plaintiff followed up with Ms. Heidel, explaining that he wanted an opportunity to discuss the reports. *Id.* ¶ 86. In response, Ms. Heidel seemed receptive to the idea. *Id.* A few days later, Plaintiff again followed up, expressing concerns regarding the investigation procedure, but Ms. Heidel never responded. Plaintiff's phone calls to Ms. Heidel also went unanswered, and he never received a call back. *Id.* ¶ 87.

In July 2023, Plaintiff attempted to initiate a conversation with one of his mentors regarding the allegations and his career path. *Id.* ¶ 88. The mentor advised Plaintiff that he and other University staff had received two investigation reports respecting the allegations against Plaintiff. *Id.*

Plaintiff contacted Ms. Gift regarding the lack of response from Ms. Heidel and with a few questions about the investigation policies and procedures. *Id.* ¶ 91. Ms. Gift responded with an explanation respecting which University procedures governed the investigation into the allegations against Plaintiff. *Id.* ¶ 92. Plaintiff followed up asking why the investigative report was provided to people not affiliated with the CIE Office and without roles defined by University policies and procedures. Ms. Gift referred Plaintiff to Vanessa Love, the University's Civil Rights and Title IX Director. *Id.* ¶ 94.

Plaintiff then contacted Ms. Love with several questions about the process and met with her to discuss the potential sanctions. *Id.* ¶ 95. Following his conversation with Ms. Love, Plaintiff filed a retaliation claim against the laboratory faculty for violating the University's policies. *Id.* ¶ 97. In July 2023, Plaintiff met with Ms. Love and Stevvaie Brown, Civil Rights and Advocacy Response Manager, to discuss his complaint and the investigation into the allegations against him.

*Id.* ¶ 98.  Several days later, Plaintiff followed up with Ms. Love requesting some information about how to proceed.  Ms. Love informed Plaintiff that his complaint would be handled by the CIE Office and Plaintiff was not entitled to view the report respecting the ongoing investigation into the allegations against him.  *Id.* ¶ 100.

After several more contacts with various University administrators and staff members, in September 2023, Plaintiff received an outcome letter, signed by Individual Defendant James Gallaher, Vice President of Human Resources, stating that "the investigation determined that you engaged in an inappropriate relationship with an undergraduate student, while working in the University's [redacted] Labs, in violation of the University's Consensual Relationship Policy . . . [and] that you committed multiple forms of relationship violence, in violation of the University's Sexual Misconduct Policy" *Id.* ¶¶ 104–110.  The letter did not outline the reasons the investigation led to these conclusions or describe the incidents of alleged abuse.  *Id.* ¶ 113.  Finally, the letter indicated that Plaintiff was barred from University property and that he would not be considered for future employment with the University.  *Id.* ¶¶ 118–119.

In October 2023, believing that the University had violated several of its own policies and Federal laws during the investigation process, Plaintiff timely appealed the University's decision. *Id.* ¶ 121.  Not hearing back by February 2024, Plaintiff emailed Individual Defendant David DeJong, Senior Vice Chancellor for Business and Operations, Individual Defendant Joseph McCarthy, Interim Provost and Senior Vice Chancellor, and Individual Defendant Geovette Washington, Chief Legal Officer, informing them of the University's repeated failures to abide by its own policies and Federal law.  *Id.* ¶ 124.  Nobody responded to Plaintiff's email.  *Id.*  In April 2024, Plaintiff received a letter from Mr. DeJong stating that "the board found that the appeal did not fall within any of the three limited ground [sic] and should be denied." *Id.* ¶ 126.

### B.  Plaintiff's Claims & Procedural History

Based upon the above allegations set forth in Plaintiff's Complaint, Plaintiff brings claims against University Defendant for Discrimination under Title IX of the Education Amendments and Breach of Contract, against Individual Defendants for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and against Defendants Laurel Gift and John Roes 1–5 for Defamation.   On May 9, 2025, Plaintiff filed a Motion to Proceed Under Pseudonym (ECF No. 4).   On July 28, 2025, Defendant filed a Motion to Dismiss, along with a Brief in Support (ECF No. 21).   On August 29, 2025, Plaintiff filed a Brief in Opposition (ECF No. 23).  On September 16, 2025, Defendant filed a Reply (ECF No. 26).  On September 24, 2025, Plaintiff filed a Motion for Oral Argument.

## II.    Legal Standard

Defendant moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).   A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.   *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).   In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits, but simply accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff.  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 554).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.*  (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675.  Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679; *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)).  Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).  When a document integral to or relied upon in the complaint is included, the court may also

consider that document.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Although a district court is not obligated to permit leave to amend before dismissing a complaint in a non-civil rights case, *Wolfington v. Reconstructive Orthopaedic Assocs. II P.C.*, 935 F.3d 187, 210 (3d Cir. 2019), courts generally grant leave to amend unless amendment of the complaint would be inequitable or futile.  *See, e.g.*, *Bachtell v. Gen. Mills, Inc.*, 422 F. Supp. 3d 900, 915 (M.D. Pa. Oct. 1, 2019) (citing *Phillips v. Allegheny Cty.*, 515 F.3d 224, 245 (3d Cir. 2008)).

## III.    Discussion

### A.  Count I – Title IX Discrimination

Plaintiff brings a claim for Discrimination pursuant to Title IX, arguing that University Defendant "deprived him of the benefits of its education program through its discriminatory, sex-based implementation of its disciplinary process, and by sanctioning him as a result of that process." ECF No. 1 ¶ 138.  Defendant moves to dismiss, arguing that Plaintiff has not adequately alleged that gender was a motivating factor in the University's processes respecting the accusations against Plaintiff.

Title IX provides that "[n]o person in the United States shall, on the basis of sex . . . be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Accordingly, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 773 (3d Cir. 2020) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).  While some Circuits "have examined Title IX claims using the doctrinal framework [that recognized four] theories under which one may allege

a Title IX violation: erroneous outcome[,] . . . selective enforcement[,] . . . deliberate indifference[,] and archaic assumptions," the Third Circuit Court has eschewed the "'need to superimpose doctrinal tests on the [Title IX] statute,'" and has instead adopted a "straightforward pleading standard." *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) (citing *Yusuf*, 35 F.3d at 714; *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018)). Accordingly, "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Univ. of Scis.*, 961 F.3d at 209; *but see St. Joseph's Univ.*, 832 F. App'x at 773–74 (analyzing a Title IX claim under the doctrinal framework).

To support the inference that Plaintiff's sex was the motivation behind how the University treated him in the aftermath of the accusations against him, Plaintiff proffers that the University's response should be examined within the context of a broader atmosphere of discrimination against men. That context, Plaintiff argues, shows that after a purported pressure campaign from the Obama Administration, the University adopted a pro-victim approach to handling accusations of sexual impropriety on campus.[2] The Trump Administration's purported reversal, with its

---

[2] Plaintiff's allegations can more specifically be summarized as follows:

President Obama's Pressure Campaign.

    a. Beginning in 2011, the Federal government began pressuring colleges and universities to take campus sexual misconduct more seriously, including the Department of Education Office of Civil Rights (the "OCR") issuing a guidance document, often referred to as the "Dear Colleague Letter," which provides statistics about the prevalence of sexual harassment and sexual violence against women and encourages schools to provide due process to alleged perpetrators in ways that do not restrict or unnecessarily delay Title IX protections for complainants. Further steps from the OCR include advice to schools to give employees and students "trauma-informed" training and conduct disciplinary hearings "in a manner that does not inflict additional trauma on the complainant."

    b. In 2014, the White House also created a Task Force, co-chaired by the Office of the Vice President and the White House Council on Women and Girls, which describes, in its First Report, statistics about sexual violence against women on college campuses and explains that the Task Force is "here to tell sexual assault survivors that they are not alone" and "we're also here to help schools live up to their obligation to protect students from sexual violence." The Task Force found that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

emphasis on due process for the accused, Plaintiff suggests, indicates that the previous pressures were unfair to men.  "Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men." ECF No. 1 ¶ 207.

---

c.   The Department of Justice funded "Start by Believing," a campaign to encourage campus communities to believe those who report sexual abuse.  Plaintiff included a link to the "Start By Believing Campus Action Kit," a bulletin describing steps campuses can take to be less hostile to abuse reports, so that victims feel safe to report and participate in colleges' investigations and responses.  Start by Believing, Campus Action Kit, WWW.STARTBYBELIEVING.ORG,    https://www.startbybelieving.org/wpcontent/uploads/2019/08/ Campus-Action-Kit.pdf (last visited February 3, 2026).

d.   End Violence Against Women International reissued a training module, for which it received a grant in 2006, titled "Effective Report Writing: Using the Language of Non-Consensual Sex," which highlighted certain shortcomings in how investigators write out sexual assault reports and provides advice on how to be more accurate, probative, and effective.  In 2014, Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, spoke at a conference at University of Virginia, claiming that existing practices "send a message . . . that victimized students are worth less than the people who assault them."  Beginning in 2014, the OCR began to investigate colleges and universities more aggressively for allegations that they had failed to adequately address sexual assault and harassment claims by students.

Schools Succumb to Federal Pressure.  Following the pressure the Federal Government placed on them, colleges began adopting new processes to address allegations of sexual misconduct.  At some schools, that meant accused students received fewer protections than before.  Some schools have gone beyond the guidance of the OCR. Several of these additional steps, Plaintiff argues, go too far.  He alleges that some colleges and universities have implemented "procedures favoring alleged victims (the great majority of whom are female) and essentially eliminating fair process protections for respondents (the great majority of whom are male)," trainings that lead Title IX investigators "to presume that an alleged assault occurred, that a complainant's account of an incident must be true, and that a complainant's subjective impressions determine whether conduct is sexual harassment or assault," and policies that lead to accused students being "suspended or expelled without meaningful notice or opportunity to be heard."  Plaintiff also quotes several university administrators and public officials who concede that some of the pressures under President Obama may have been too harsh on accused perpetrators of sexual assault on campus.

President Trump Reverses Course. In 2017, citing concerns about fairness to accused perpetrators, the Department of Education essentially rescinded the Dear Colleagues Letter, advising that accepting an accusation by an alleged victim as an important piece of evidence "lack[s] the most basic elements of fairness and due process."  In 2018, the Department of Education published new proposed regulations designed to ensure that those "accused of serious misconduct receive notice, a fair hearing before unbiased decision makers, and a presumption of innocence."  In 2020, the final regulations were published, setting forth requirements for the grievance and disciplinary processes, stressing the importance of fairness and due process.

University of Pittsburgh.  Plaintiff cites numerous times that University Defendant allegedly "made its goal of protecting survivors, discriminating against [men], and stripping the accused of due process rights well known." This includes adopting a "trauma-informed approach" to accusations, publishing articles on bringing women's voices to the forefront of the conversation on sexual assault, inviting speakers to campus to discuss intersectional feminism, highlighting the number of student organizations for women, issuing statements on the history of bias against women in academia compared to their male counterparts, and an article in Pitt News recounting an incident of sexual assault and criticizing the University's response.

Plaintiff contends that he has a claim against University Defendant under each theory within the Title IX doctrinal framework: the University "reached an erroneous outcome, selectively enforced its disciplinary procedures, applied archaic assumptions, and acted with deliberate indifference based on [Plaintiff]'s sex." *Id.* ¶ 216. That said, by the Court's reading, Plaintiff only actually advances arguments under the erroneous outcome theory. While the Third Circuit Court has indicated a preference for a more straightforward pleading standard, the erroneous outcome theory falls within this Circuit's pleading standard, which simply requires a showing that a "college or university discriminated against a person on the basis of sex." *Univ. of Scis.*, 961 F.3d at 209. "To prevail on an erroneous-outcome claim, a plaintiff must 'cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and then show 'particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *St. Joseph's Univ.*, 832 F. App'x at 773 (quoting *Yusuf*, 35 F.3d at 715). "Mere allegations [that] a flawed proceeding led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination does not satisfy an erroneous outcome claim." *Saravanan v. Drexel Univ.*, No. 17-3409, 2017 WL 5659821, at *4 (E.D. Pa. Nov. 24, 2017) (internal quotations omitted).

The Court recognizes that, from Plaintiff's perspective, the outcome of the University's investigation was disappointing. But the Court simply does not see a clear link between any alleged shortcomings in the investigation process and gender bias. While Plaintiff has made assertions of bias, he has offered no evidentiary support for these assertions whatsoever. He has provided no well-pled facts about how Defendant University treats women accused of the same improprieties and instead lists numerous perfectly normal steps by and within the Executive Branch of the Federal Government and the University, all seemingly reasonably designed to

combat sexual violence and harassment, which Plaintiff then colors as suspicious or discriminatory against men.  For instance, while Plaintiff specifically points out that the "Dear Colleague Letter" includes statistics about the prevalence of sexual harassment and sexual violence against women, the Court observes that the letter includes information about sexual violence against men, as well. The same is true of the White House Task Force's First Report, which Plaintiff accuses of having the audacity to "open with the claim that '[o]ne in five women is sexually assaulted in college.'" But that same short paragraph concludes by saying that "men, too, are victims of these crimes."

More relevantly, in his accusations against Defendant University itself, Plaintiff complains that the University invited people to campus to discuss, or endorsed messages respecting, issues relevant to the University's community, such as the history of gender bias in academia, intersectional feminism, and criticism of the University's response to sexual assault.  While the Court understands that Plaintiff means to highlight that the University focuses to a large degree on making women on campus feel welcome, this focus does not, on its own, suggest that the University harbors a bias against men.  It certainly does not imply that any treatment that Plaintiff sees as unjust is motivated by gender bias.  Further, taking a "trauma-informed approach" to accusers who come forward alleging abuse is also not an indication of bias.  First, as far as the Court can tell, "trauma-informed" does not carry the supposedly "well-known" implication, as Plaintiff puts it, that this policy advises investigators not "to explore credibility or other issues [and instead simply] believe all accusers."  As Plaintiff explains elsewhere in the Complaint, being "trauma-informed" means taking an empathetic approach when dealing directly with the accuser, to avoid inflicting further trauma.  ECF No. 1 ¶ 154.  Second, and more importantly, being trauma-informed when someone comes forward with an assault allegation has nothing to do with gender.

Ultimately, Plaintiff does make an unpersuasive attempt to tie his frustration over how the University handled the accusation against him to gender bias. As Plaintiff puts it, broadly, overzealous attempts to combat sexual violence and harassment on campus are inherently discriminatory against men. From what the Court sees in the record, the reason the University takes sexual misbehavior seriously is not specifically intended to target, investigate, and discipline men. On the contrary, to the extent that Plaintiff has alleged that the University disproportionately puts men through what Plaintiff characterizes as a poorly constructed and executed investigation and disciplinary process, Plaintiff himself has furnished an argument dispelling the notion that the University's actions are motivated by gender bias. "[C]ases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man." ECF 1 ¶ 207. In other words, the University's gender-neutral policy disproportionately impacts men, because those accused are mostly men. To state a claim of gender bias, it is not enough to argue, as does Plaintiff, that "measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men." ECF No. 1 ¶ 207. On the contrary. Plaintiff must allege that such a result is not necessary and is instead a choice the University made. To put it bluntly, it may very well simply be the case that more women are the victims of sexual violence or harassment and more men are the perpetrators. And if that is the case, universities quite naturally and predictably receive more complaints from women and against men. And as a result, most universities' investigations and disciplinary actions are of and against men. But barring any well-pled facts showing that men are not more often the perpetrators and women not more often the victims, the allegations do not support a finding that the disparate outcomes arise because the policies are designed to target men or with bias against men.

Plaintiff cites an opinion from the Eastern District of Pennsylvania that survived a motion to dismiss on similar facts to the case at bar, due, in part, to the fact that men are typically the ones accused and therefore the university's policies resulted in harsher treatment of men. *Doe v. The Trs. of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 823–24 (E.D. Pa. 2017). In the *Penn Trustees* case, a student at University of Pennsylvania brought an action claiming that the process by which Penn found that the student had violated the university's policies against sexual violence did not conform with Title IX. The *Penn Trustees* court found evidence in that case that the university's training materials on sexual violence that encouraged believing accusers and other indicators of a pro-accuser perspective suggested some gender bias. The court did acknowledge, however, that this was a close call. *Id.* ("These allegations are less compelling than those that were found to state a Title IX claim in *Harris* and *Brown*, because they do not include an allegation of any arguably inculpatory statements by a representative of the University. However, we nevertheless conclude that [the plaintiff states] a plausible claim."). Those other more compelling cases included more obvious instances of gender discrimination, such as where "a member of a university's ethics department and community standards board specifically stated to a plaintiff's father that the university had 'adopted a policy favoring female accusers as [the university] was concerned about Title IX charges by female students.'" *Id.* at 823 (quoting *Harris v. Saint Joseph's Univ.,* No. CV 13-3937, 2014 WL 12618076, at *2 n.3 (E.D. Pa. Nov. 26, 2014)). No such evidence that the policy is designed to favor women, as was found in *Harris* and *Brown*, is before this Court in this case.

Moreover, while the Court is respectful of the persuasive authority of the *Penn Trustees* case, it is not binding on this Court and not issued from within this District. More importantly, this Court has a more thorough impression of the facts in the present matter than it does respecting

the *Penn Trustees* case. This Court finds that this case is not a close call. As Judge Wilson of the United States District Court for the Eastern District of Arkansas ruled, while sitting by designation and assignment by the Chief Justice of the United States in this District, mere allegations about the disparate treatment between the accuser and the accused do not support a finding of gender bias. *Haynes v. Clarion Univ. of Pennsylvania*, No. 2:15-CV-01389-BRW, 2018 WL 11206626, at *3 (W.D. Pa. June 27, 2018) ("Plaintiff has also failed to provide a basis for a finding of gender bias. He has not pointed to any instance where a female student facing [similar discipline] was treated more favorably. Plaintiff attempts to show bias by the difference in treatment between himself and [his accuser]. His argument that Defendants' preferable treatment of an alleged rape victim over an alleged rapist evidences [gender] bias is without merit."). The Court agrees. Gender bias must be proven by comparison to individuals otherwise similarly situated. If Plaintiff contends that he was treated with gender bias, he must, at the least, allege that women accused of the same or substantially similar impropriety are treated differently.

On this argument, Plaintiff echoes another case from the Eastern District. Plaintiff alleges that "the University credited exclusively female testimony and rejected all male 'testimony' by way of his interview." ECF No. 23 at 7 (citing *Doe v. Univ. of Scis.*, No. CV 19-358, 2019 WL 632022, at *5 (E.D. Pa. Feb. 14, 2019 (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)) ("[T]he Sixth Circuit, in *Baum*, found the plaintiff sufficiently alleged gender-motivated bias where he alleged [*inter alia*] the university's disciplinary board credited exclusively female testimony and rejected all male testimony."). But this is merely a rhetorical equivocation. The concept recognized by both the *Doe* Court and the Sixth Circuit as adequate to allege gender-motivated bias is not simply that in this case the testimony of the accuser, who happens to be a woman, was credited, while that of the accused, who happens to be a man, was not. Rather, the

15

facts must show a pattern in which the perspectives and testimony of similarly situated women are deemed more credible than that of men. In other words, the testimony of a woman is generally credited more heavily, not because she is the accuser, but because the testimony is from a woman, and the testimony of a man is not credited, not because he is the accused, but because it comes from a man. Plaintiff has not provided facts showing this.

The Court finds that the Complaint does not adequately allege facts to support the claim that gender was a motivating factor behind University Defendant's process or findings respecting the accusations against Plaintiff. Accordingly, as to the claim under Title IX, the Court will grant Defendant's Motion to Dismiss.

### B. Count II - Due Process Clause Violation

Plaintiff brings a claim against the Individual Defendants for violating his Due Process rights under the Fourteenth Amendment, arguing that he had a protected interest in his good name, reputation, and future educational and employment opportunities, all of which the University deprived him of without affording him due process. Defendant moves to dismiss, arguing that Plaintiff has not adequately alleged that he had a protectable property or liberty interest or that he suffered cognizable harm, and that the Individual Defendants have qualified immunity.

Under the Fourteenth Amendment, "a state may not authorize the deprivation of a protected liberty or property interest without providing a procedure in connection with that deprivation that meets the requirements of due process." *Sample v. Diecks*, 885 F.2d 1099, 1114 (3d Cir. 1989). To state a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must allege:

> (1) that he was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected the plaintiff, or caused the plaintiff to be subjected to, this deprivation without due process; (4) that the Defendant was acting under color of state law; and (5) that the plaintiff suffered injury as a result of the deprivation without due process.

*Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 402 (M.D. Pa. 2013) (quoting *Sample*, 885 F.2d at 1113–14).

A protected interest in a particular benefit exists only when a plaintiff can "show 'more than an abstract need or desire for it. He must have more than unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *State Troopers Non–Commissioned Officers Ass'n of New Jersey v. New Jersey*, 399 Fed. App'x 752, 755 (3d Cir. 2010) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). An informal business relationship does not establish a protected property interest, and courts instead rely on what the parties have formally agreed would be provided to the plaintiff's benefit. *See, e.g.*, *One Three Five, Inc. v. City of Pittsburgh*, 951 F. Supp. 2d 788, 822 (W.D. Pa. 2013) ("[T]he merits of [the plaintiff's claim of a property interest] will necessarily rely on the terms and conditions of the parties' written agreement because the lengthy business relationship between the parties alone is insufficient to create a cognizable property interest under the Due Process Clause."); *see also Piecknick v. Com. of Pa.*, 36 F.3d 1250 (3d Cir. 1994) (finding not only that an expectation of a benefit does not create a property interest, but even an at will contractual benefit, because it can be terminated at will, is not entitled to due process protections). The fact that the University cut its ties with Plaintiff, who had a loosely defined association with his previous lab and staff, did not deprive Plaintiff of a property right protected by the Due Process Clause.

Individuals have an interest in their reputation, and the specter of due process violations is raised "[w]here a person's good name, reputation, honor, or integrity is at stake." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). However, "'stigma' . . . does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due

Process Clause." Thus, to state a due process claim when defending his good name, a plaintiff must show "'a stigma to his reputation plus deprivation of some additional right or interest.'" *Dee v. Borough of Dunmore*, 549 F.3d 225, 233–34 (3d Cir. 2008) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006)). "In the public employment context, the 'stigma-plus' test has been applied to mean that when an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest." *Hill*, 455 F.3d at 236 (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977)). "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'" *Id.*

To establish that a plaintiff has been the victim of "stigma," he must provide evidence that there was a "(1) publication of (2) a substantially and materially false statement that (3) infringed upon the reputation, honor, or integrity of the employee." *Brown v. Montgomery Cnty.*, 470 Fed. App'x. 87, 91 (3d Cir. 2012). To establish that the plaintiff was the victim of more than just stigma, that is, that there was "plus," he must provide evidence that the stigma was inflicted "'in the course of being terminated or constructively discharged.'" *Dee*, 549 F.3d at 234 n. 11 (quoting *Hill*, 455 F.3d at 238).

Plaintiff does not contest that he was not terminated, but instead proposes an analysis of the interest in his reputation that does not require a termination. In fact, Plaintiff's proposed analysis is so lacking that it "turns the 'stigma-plus' test into a 'stigma-minus' test." *McCleester v. Mackel*, No. CIV.A. 06-120J, 2008 WL 821531, at *20 (W.D. Pa. Mar. 27, 2008). He argues not only that the publication of negative information does not need to be in the course of a termination (that is, there is no need for "plus"), but also that the publication need not be false (that is, even one of the elements of "stigma" need not be met). Plaintiff cites *Dondero v. Lower Milford*

*Twonship* to rebut Defendants' claim that a stigma-plus claim requires a termination, arguing that *Dondero* only requires that the stigmatizing statement be public and false.  *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 360 (3d Cir. 2021).  It is true that *Dondero* does not do a "plus" analysis, but that is because the court considered the issue moot as the plaintiff had already failed to satisfy the "stigma" prong of the analysis.

And indeed, that is the case in the matter before the Court here, as well.  The Complaint mentions two instances when Defendants disseminated information respecting the allegations against and investigation into Plaintiff.  The first was when Laurel Gift informed Plaintiff by email that she or the University had notified Plaintiff's employer of the allegations against him.  ECF No. 1 ¶ 70.  The second was when one of Plaintiff's mentors informed Plaintiff that he and other University staff had received reports related to the investigation into Plaintiff.  *Id.* ¶ 88.   Plaintiff makes no assertion that such allegations against him had not been made or that the investigation was not ongoing.  As such, as per the Complaint, at the time of their dissemination, these claims were true.  Whatever inference Plaintiff's employer or mentor might have made from those reports do not render the claims untrue and cannot sustain a stigma-plus claim.  *See*, *e.g.*, *O'Connor v. Pierson*, 426 F.3d 187, 195 (2d Cir. 2005) (finding that even if a negative inference was made, that "is not enough to make out a stigma-plus claim").

The Court finds that the Complaint does not adequately allege facts to support the claim that Defendant deprived Plaintiff of his property rights without due process.  Accordingly, as to the claim under the Due Process Clause, the Court will grant Defendant's Motion to Dismiss.

### C.  Remaining State Claims

"Federal courts are courts of limited jurisdiction."  *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).  "[I]n any civil action of which the district courts

have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C.A. § 1367(a). A district court may, however, decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.A. § 1367(c)(3). In making a determination to decline to exercise supplemental jurisdiction, "the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'" *Growth Horizons, Inc. v. Delaware Cty., Pa.*, 983 F.2d 1277, 1284 (3d Cir. 1993) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Because the Title IX and Due Process claims were the sole jurisdictional bases that brought this action to this District, the Court finds it premature to make any findings related to the remaining state claims for Breach of Contract and Defamation without the presence of a federal question before the Court. The factors of judicial economy, convenience, fairness, and comity all weigh in favor of this Court declining to exercise supplemental jurisdiction without conviction that there is a claim respecting federal law to which the remaining state claims are ancillary. Accordingly, if an amended complaint does not present a credible federal question, the Court will be inclined to dismiss the remaining state-law claims to allow Plaintiff to pursue the same in state court. Pending any such amendment, the court declines to exercise supplemental jurisdiction over the state claims at this time.

### IV.    Conclusion

For the reasons discussed above, Defendant's Motion to Dismiss is hereby granted. Plaintiff may file an amended complaint within 21 days of this Memorandum Order.  Plaintiff's Motion to Proceed Under a Pseudonym is uncontested and is therefore hereby granted.  Plaintiff's Motion for Oral Arguments is hereby denied as moot.


BY THE COURT:


*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: February 24, 2026

cc: All counsel of record,